IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


|                                        |     |          |
|----------------------------------------|-----|----------|
| LEE YOUNG                              | )   |          |
|                                        | )   |          |
|     Plaintiff,     | )   |          |
|                                        | )   |          |
|     v.             | )   | 1:08CV894 |
|                                        | )   |          |
| NORTH CAROLINA AGRICULTURAL            | )   |          |
| AND TECHNICAL STATE UNIVERSITY,        | )   |          |
| BOARD OF GOVERNORS OF THE              | )   |          |
| UNIVERSITY OF NORTH CAROLINA,          | )   |          |
| DR. STANLEY BATTLE                     | )   |          |
|                                        | )   |          |
|     Defendants.    | )   |          |


## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

    This matter is before this court for review of the
Recommendation of United States Magistrate Judge
("Recommendation") (Doc. 30) filed on November 22, 2010, by the
Magistrate Judge in accordance with 28 U.S.C. § 636(b).  In the
Recommendation, the Magistrate Judge recommended that Defendants'
Motion for Summary Judgment (Doc. 20) be granted.  The
Recommendation was served on the parties to this action on
November 22, 2010.  Plaintiff timely filed his Objections to
Recommendation of United States Magistrate Judge ("Objections")
on December 9, 2010. (Doc. 36).  Defendants[1] timely filed their

---

[1] The term "Defendants" is used to collectively refer to all
Defendants.  Defendant North Carolina Agricultural and Technical

Response to Plaintiff's Objections (Doc. 43) on December 17, 2010.

This court is required to "make a de novo determination of those portions of the [Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . . or recommit the matter to the magistrate judge with instructions." Id.

This court has appropriately reviewed the portions of the Recommendation to which objection was made and has made a de novo determination which is in accord with the Magistrate Judge's Recommendation. This court therefore adopts the Recommendation in full, but elaborates on the Magistrate Judge's reasoning as follows. This court also notes that Plaintiff has raised, in his Objections and at the summary judgment hearing before this court, new arguments that were not raised in his Amended Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Response") (Doc. 27) and, thus, were not addressed in the Recommendation. Nonetheless, this court will consider those arguments here.

---

State University will hereinafter be referred to as "University" or "NCA&T." Defendant Board of Governors of the University of North Carolina will hereinafter be referred to as "Board of Governors."

## I.  BACKGROUND

This court adopts the facts as found by the Magistrate Judge, but also offers the following undisputed facts necessary to the analysis set forth herein.  At all relevant times, Plaintiff's employer was Defendant NCA&T,[2] and his immediate supervisor was Dr. Janice G. Brewington ("Dr. Brewington"). (Young Dep. (Doc. 26-2) at 16; Brewington Aff. (Doc. 20-4) ¶ 4.) In his role as Associate Vice Chancellor for Enrollment Management/Director of Admissions ("AVC-EM"),[3] Plaintiff was an employee "at-will," who "serve[d] at the Chancellor's discretion." (Pl.'s Exs. Mem. Opp'n Defs.' Mot. Summ. J. [hereinafter Pl.'s Supplement] Ex. Z (Doc. 26-27) at 3, Part 2(E)(1)(b).)

As a Senior Administrative Officer Tier-I, Plaintiff was subject to the Board of Trustees' Employment Policies for EPA

---

[2] This court notes that Defendant NCA&T is a constituent university governed by Defendant Board of Governors.  (Compl. (Doc. 4) ¶ 5; Answer (Doc. 7) ¶ 5; see also N.C. Gen. Stat. §§ 116-3, 116-11 (2009).)

[3] At various times throughout the record, the title of the last position held by Plaintiff prior to his termination from NCA&T is referred to as Associate Vice Chancellor of Academic Affairs for Enrollment Management. (See, e.g., Compl. (Doc. 4) ¶ 8; Defs.' Mot. Summ. J. Ex. 10 (Doc. 20-9) at 362; Pl.'s Exs. Mem. Opp'n Defs.' Mot. Summ. J. [hereinafter Pl.'s Supplement] Ex. E (Doc. 26-6) at 1.)  However, for the sake of simplicity and because the title Associate Vice Chancellor for Enrollment Management is used most frequently in the record, this court will refer to Plaintiff's last position prior to termination as Associate Vice Chancellor for Enrollment Management or by using the acronym "AVC-EM."

Non-Faculty ("EPA Policies"). (Id. at 1, Part 1(A), (B).) The
EPA Policies specifically provide that Senior Administrative
Officers-Tier-I "do not have tenure in their administrative
positions" and that their "continuance in office . . . shall be
determined by the Chancellor." (Id. at 3, Part 2(E)(1) and
2(E)(1)(b).) The EPA Policies prohibit the Chancellor from
"purport[ing] to confer on any such officer a period of
employment of fixed duration or otherwise confer[ring] any
property interest in such employment." (Id. at 3, Part
2(E)(1)(b).) Finally, the EPA Policies state that "[a]n EPA non-
faculty employee who is employed at will has no claim to a
position at the University. The University may determine that it
is in its best interest to assign an employee without faculty
retreat rights to another administrative or teaching position."
(Id. at 5, Part 3(c).) If and when the University determines
that it is in its best interest to assign an EPA non-faculty
employee to another administrative position, the EPA Policies
mandate that the employee's "new salary must be appropriate to
the assignment."[4] (Id.)

According to the EPA Policies, the authority to hire
Plaintiff was vested solely in the Chancellor or the Chancellor's
designee. (See id. at 2, Part 2(A) ("Every appointment to an EPA

_____

[4] This court construes this language to mean that the new
salary must be appropriate to the new assignment, without regard
to the employee's former position and salary.

non-faculty position shall be made by the Chancellor or Chancellor's designee by means of a letter of appointment . . . .").) Similarly, the Chancellor and/or his designee possessed exclusive authority to discontinue Plaintiff's employment with the University. (See id. at 4, Part 3(A) ("Employment within an EPA position that is established by the letter of appointment to be employment 'at will' is subject to discontinuation at any time at the discretion of the Chancellor or Chancellor's designee.").)

In May 2006, Dr. Lloyd V. Hackley ("Interim Chancellor Hackley") assumed the role of Interim Chancellor at NCA&T and continued in that role through June 2007. (Hackley Aff. (Doc. 20-5) ¶ 2.) In or around May 2007, Interim Chancellor Hackley decided to post Plaintiff's AVC-EM position based upon his "concerns about what Plaintiff was doing to raise the number and the academic quality of entering students." (Id. ¶ 4-5.) Dr. Brewington notified Plaintiff that his position would be posted in mid-May 2007. (Young Dep. (Doc. 26-2) at 48-50; see also Brewington Aff. (Doc. 20-4) ¶ 7; Hackley Aff. (Doc. 20-5) ¶ 5.)

On July 1, 2007, Dr. Stanley Battle ("Chancellor Battle") assumed the role of Chancellor at NCA&T. (Brewington Dep. (Doc. 26-4) at 34.) On July 3, 2007, Dr. Brewington appointed eight (8) University employees to serve as the Search Committee for the Associate Vice Chancellor for Enrollment Management ("AVC-EM Search Committee"). (Defs.' Mot. Summ. J. Ex. 4 (Doc. 20-9) at

219.) As a part of their responsibilities, the AVC-EM Search Committee was directed to "[implement] . . . a process for evaluating the credentials of all applicants/nominees" and to "[schedule] and [coordinate] campus interviews for all candidates." (Id.) The AVC-EM Search Committee did not select Plaintiff for an interview. (Brewington Aff. (Doc. 20-4) ¶ 8.)

On July 19, 2007, Dr. Brewington informed Plaintiff during a meeting that he had not been selected by the AVC-EM Search Committee to receive an interview for the AVC-EM position. (Young Dep. (Doc. 26-2) at 53; Pl.'s Supplement Ex. S (Doc. 26-20) at 1.) In response, Plaintiff informed Dr. Brewington that he would be applying for FMLA leave. (Young Dep. (Doc. 26-2) at 53-54; see also Pl.'s Response (Doc. 27) at 3.) Plaintiff submitted an application for FMLA Leave to Human Resources on August 22, 2007. (Young Dep. (Doc. 26-2) at 45; Pl.'s Supplement Ex. K (Doc. 26-12) at 1.)

Plaintiff and Dr. Brewington exchanged a series of e-mails in late August and early September 2007. In her e-mail of August 31, 2007, Dr. Brewington told Plaintiff that she "did receive the FMLA information from HR" and that she "[was] supportive." (Pl.'s Supplement Ex. P (Doc. 26-17) at 1.) Dr. Brewington concluded her e-mail by asking Plaintiff to "let [her] know as soon as possible . . . if [he] still want[ed] [her] to pursue the position with Dr. Welborne next week." (Id.) Prior to sending

that e-mail, Dr. Brewington had "contacted Dr. Sullivan Welborne [("Dr. Welborne")], Vice Chancellor of Student Affairs, and inquired whether Dr. Welborne had a position available that would be a fit for Plaintiff."  (Brewington Aff. (Doc. 20-4) ¶ 13.)  Dr. Welborne informed Dr. Brewington that he could "provide a position for Plaintiff paying up to $75,000," and Dr. Brewington conveyed that information to Plaintiff in her August 31, 2007 e-mail.  (Id.; Pl.'s Supplement Ex. P (Doc. 26-17) at 1.)

Plaintiff responded to Dr. Brewington by e-mail a week later, indicating that he "was surprised to learn of the salary for the position that [Dr. Brewington] and Dr. Welborne [were] considering for [him]" because "[i]t represent[ed] an approximate 40-45% reduction in [his] current salary."  (Pl.'s Supplement Ex. R (Doc. 26-19) at 1.)  Plaintiff further indicated that he "[was] very interested in remaining at North Carolina A & T State University in a position equivalent to [his] current position" and that he "would be willing to accept a reasonable salary reduction."  (Id. (emphasis added)).  According to Plaintiff's version of the facts,[5] Plaintiff and Dr. Brewington did not

_____

    [5] Defendants' version of the facts differs from Plaintiff's concerning the communications that took place between September 7, 2007, and September 25, 2007.  (See, e.g., Brewington Aff. (Doc. 20-4) ¶ 15.)  However, at the summary judgment stage, the nonmoving party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, [and] the most favorable of possible alternative inferences from it drawn in his behalf."  Charbonnages de France

communicate again until on or about September 25, 2007, when
Plaintiff received a telephone call from Dr. Brewington notifying
him of his termination. (Young Dep. (Doc. 26-2) at 55-61; <u>see
also</u> Pl.'s Response (Doc. 27) at 5; Compl. (Doc. 4) ¶ 17-18.) On
or about September 28, 2007, Plaintiff received a letter from Dr.
Brewington notifying him that, "effective September 26, 2007,
[his] services and administrative responsibilities as Associate
Vice Chancellor for Enrollment Management for North Carolina A&T
State University [would] be discontinued." (Pl.'s Supplement Ex.
S (Doc. 26-20) at 1; Compl. (Doc. 4) ¶ 18.)

## II. ANALYSIS

Section 2615 of the Family and Medical Leave Act ("FMLA"),
29 U.S.C. § 2601 <u>et seq.</u>, makes it "unlawful for any employer to
discharge or in any other manner discriminate against any
individual for opposing any practice made unlawful [under the
FMLA]." 29 U.S.C. § 2615. The Fourth Circuit has held that
"FMLA claims arising under the retaliation theory are analogous
to those derived under Title VII and so are analyzed under the
burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>."
<u>Yashenko v. Harrah's NC Casino Co.</u>, 446 F.3d 541, 550-51 (4th
Cir. 2006); <u>see also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.
792, 800-806 (1973). Under the first prong of the <u>McDonnell</u>

———————————————

<u>v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Therefore, this
court adopts Plaintiff's version of the facts as it concerns
these communications.

<u>Douglas</u> framework, the plaintiff must establish a prima facie case of retaliation. <u>Yashenko</u>, 446 F.3d at 551. If the plaintiff employee fails to establish a prima facie case of retaliation, summary judgment should be granted for the defendant employer. <u>See generally</u> <u>Henson v. Liggett Grp., Inc.</u>, 61 F.3d 270, 274 (4th Cir. 1995) (noting that under the <u>McDonnell Douglas</u> framework, the defendant employer is entitled to summary judgment if the plaintiff employee fails to establish a prima facie case).

To establish a prima facie case of retaliation under the FMLA, the plaintiff must demonstrate that: (1) he engaged in a protected activity, (2) his employer took an adverse employment action against him, and (3) the adverse employment action was causally connected to the plaintiff's protected activity. <u>Yashenko</u>, 446 F.3d at 551. It is undisputed that Plaintiff engaged in a protected activity when he applied for and was granted leave under the FMLA. <u>See</u> <u>id.</u> (recognizing that taking FMLA leave is protected activity). (<u>See also</u> Defs.' Mem. Supp. Mot. Summ. J. (Doc. 21) at 9; Pl.'s Response (Doc. 27) at 13.) However, because Plaintiff has failed to establish the second and third elements of his prima facie case of retaliation, summary judgment should be granted in favor of Defendants.[6]

---

[6] As noted previously, this court has adopted the analysis of the Magistrate Judge; therefore, the foregoing analysis addresses the new issues and arguments raised by Plaintiff in his Objections to the Recommendation.

## A.  Adverse Employment Action

First, Plaintiff has failed to demonstrate that Defendants subjected him to an adverse employment action as required under the second element of a retaliation claim.  "An adverse employment action is one that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment."  Bosse v. Baltimore Cnty., 692 F. Supp. 2d 574, 588 (D. Md. 2010) (alteration in original) (internal quotation marks omitted).  To demonstrate that an employment action was adverse, the plaintiff-employee "must show that a reasonable employee would have found the challenged action materially adverse."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

As noted by the Magistrate Judge, in the typical retaliation claim under the FMLA, the adverse employment action suffered by the plaintiff is his termination from the position he held before he took FMLA leave.  (See Recommendation (Doc. 30) at 10.)  See, e.g., Yashenko, 446 F.3d at 551; see also Wright v. Sw. Airlines, 319 F. App'x 232, 233 (4th Cir. 2009); Moss v. City of Abbeville, ___ F. Supp. 2d ___, No. 8:09-CV-01859-PBH, 2010 WL 2851195, at *4 (D.S.C. July 15, 2010); Findlay v. PHE, Inc., No. 1:98CV01068, 1999 WL 1939245, at *4 (M.D.N.C. Apr. 16, 1999) (noting that discharge is "paradigmatic adverse employment action").

Here, Plaintiff does not overtly contend that he was terminated from his position as AVC-EM in retaliation for his

taking of FMLA leave.[7]  Nevertheless, as an attempt to show an

adverse employment action by the University, Plaintiff has

referred to the fact that the University "terminated" his

employment while he was on FMLA leave.  (Pl.'s Response (Doc. 27)

at 13.)  Yet, the record only reflects one termination--that is,

Plaintiff's termination from the AVC-EM position.  (See infra

Part II.A.1 at 19-20.)  Consequently, in light of Plaintiff's

broad references to his termination as one possible basis for his

retaliation claim, this court finds that it is necessary to begin

this analysis with an explanation of why Plaintiff's termination

from the AVC-EM position would not support a retaliation claim.[8]

_____

[7] In fact, at the summary judgment hearing held before this
court on December 30, 2010, Plaintiff conceded that his
"remov[al] from his position as associate vice chancellor [was]
not an action that was taken in retaliation for any FMLA leave."
(Tr. Summ. J. Hr'g (Doc. 46) at 7, Dec. 30, 2010.)

[8] To support this "termination" theory of adverse
employment action, Plaintiff cites 29 C.F.R. § 825.216.  (See
Pl.'s Response (Doc. 27) at 13.)  However, Plaintiff has not
specifically claimed a direct right to reinstatement to an
equivalent position under section 2614(a)(1) of the FMLA.  See 29
U.S.C. § 2614(a)(1).  See Yashenko, 446 F.3d at 546
(distinguishing between the substantive, prescriptive rights
afforded by section 2615(a)(1) of the FMLA and the proscriptive
protections arising under section 2615(a)(2)).  "Claims of
alleged violations of these prescriptive rights" arise under 29
U.S.C. § 2615(a)(1) and are "known as 'interference' or
'entitlement' claims;" whereas, claims of alleged violations of
the proscriptive protections arise under section 2615(a)(2) and
serve to "protect employees from discrimination or retaliation
for exercising their substantive rights under the FMLA."  Id.
Throughout the course of this action, Plaintiff has framed his
claim as a claim for discrimination and retaliation under 29
U.S.C. § 2615(a)(2).  (See Compl. (Doc. 4) ¶ 29; Pl.'s Response
(Doc. 27) at 9, 12-13; Pl.'s Objections (Doc. 36) at 4-5.)

By addressing this possible theory of adverse employment action, this court does not intend to suggest that Plaintiff's termination from the AVC-EM position was separate from the termination that became effective on September 26, 2007. (<u>See</u> Pl.'s Supplement Ex. S (Doc. 26-20) at 1.) On the contrary, as discussed in Part II.A.1 below, this court finds that those two events are one and the same. (<u>See</u> <u>infra</u> Part II.A.1 at 19-20.)

Plaintiff's termination from the AVC-EM position would not demonstrate adverse employment action because he is not able to show that there was a causal connection between the termination and his taking of FMLA leave. In <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 657 (4th Cir. 1998), the Fourth Circuit reasoned that "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element [i.e. the causal connection element] of the prima facie case [of retaliation]." In the same way, Plaintiff could not establish a causal connection between his termination from his role as AVC-EM and his taking of FMLA leave because he has failed to establish that NCA&T knew of his intent to take FMLA leave at

_____

Therefore, Plaintiff's invocation of the substantive rights of the FMLA to support his discrimination claim under section 2615(a)(2) is misplaced. <u>See</u> 29 U.S.C. § 2615(a)(2). <u>See also</u> <u>infra</u> notes 14, 21.

the time the decision was made to post the AVC-EM position or at the time the AVC-EM Search Committee decided not to interview Plaintiff.

It is undisputed that Interim Chancellor Hackley decided to post Plaintiff's position several months before Plaintiff applied for FMLA leave. (Young Dep. (Doc. 26-2) at 45, 50; Hackley Aff. (Doc. 20-5) ¶ 4-5.) Moreover, Plaintiff did not inform Dr. Brewington of his desire to take FMLA leave until July 19, 2007, <u>after</u> Dr. Brewington told Plaintiff that he had not been selected to interview for the AVC-EM position. (Young Dep. (Doc. 26-2) at 53-54.) This court further finds that even if Plaintiff could establish that Dr. Brewington knew of his desire to take FMLA leave before July 19, 2007, he still has not produced any evidence to suggest that the AVC-EM Search Committee knew of his desire to take FMLA leave when it decided not to interview him. Both Interim Chancellor Hackley's decision to post Plaintiff's position and the AVC-EM Search Committee's subsequent decision not to interview Plaintiff determined that Plaintiff's employment at NCA&T would not continue upon selection of a new AVC-EM. Therefore, Plaintiff cannot establish a causal relationship between his termination from the AVC-EM position and his taking of FMLA leave, since he has failed to establish that the University was aware of his desire to take FMLA leave when these two decisions were made.

For the reasons set forth above, Plaintiff's termination from the AVC-EM position could not establish the second element of his prima facie case, even if it were his theory of adverse employment action, because it would fail at the third element of the prima facie case (i.e. causal connection).  Nevertheless, Plaintiff has presented other theories to support his argument that he suffered an adverse employment action, and this court will address each of those theories in turn.

### 1.  Plaintiff's Termination from "Some Type of Employment With the University"[9] Other Than His Position as AVC-EM

In Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff advances two different theories of adverse employment action.  First, Plaintiff alleges that "the University took an adverse employment decision against [Plaintiff]" when "it terminated [Plaintiff's] employment while [he] was on FMLA leave."  (Pl.'s Response (Doc. 27) at 13.)  Second, Plaintiff alleges that "the University took an adverse employment decision against [Plaintiff] when it withdrew him [from] consideration for the open position, and any other positions."  (Id. at 13-14.) This second theory will be addressed in Part II.A.2 below.

As noted above and by the Magistrate Judge, Plaintiff's first theory of adverse employment action does not explicitly rely upon Plaintiff's termination from the AVC-EM position.  (See

---

[9] See Tr. Summ. J. Hr'g (Doc. 46) at 6.

supra Part II.A at 11 & n.7; see also Recommendation (Doc. 30) at
11-12.)  Instead, Plaintiff generally contends that the
University took an adverse employment action against him when "it
terminated his employment while [he] was on FMLA leave." (Pl.'s
Response (Doc. 27) at 13.)  Yet, Plaintiff has produced no
evidence of any termination other than his termination from the
AVC-EM position.

     During the summary judgment hearing, this court asked
Plaintiff's Counsel to clarify what adverse employment action
Defendant NCA&T took with respect to Plaintiff.  (Tr. Summ. J.
Hr'g (Doc. 46) at 6.)  Plaintiff's Counsel again broadly
referenced Plaintiff's "termination."  (Id.)  When asked whether
Plaintiff's Counsel was referring to Plaintiff's termination from
the AVC-EM position, Plaintiff's Counsel responded:

> No, your Honor.  We would submit that those
> are two entirely distinct issues.  The
> decision that was made that he would not be
> rehired was made in July.  The termination was
> made in September of 2007, many months
> afterwards, and everything that was done in
> between that time period supports the claim
> that it was intended that he would remain in
> his employment with the university.

(Id.)  Plaintiff's Counsel subsequently described that employment
as "[s]ome type of employment with the university" other than the
AVC-EM position.  (Id.)

     Plaintiff has provided no evidentiary support for his
contention that he had "[s]ome type of employment with the

university" apart from his employment as AVC-EM. (Id.)
Additionally, Plaintiff's claim, if true, would violate the EPA
Policies, which state that "[a]n EPA non-faculty employee who is
employed at will has no claim to a position at the University."
(Pl.'s Supplement Ex. Z (Doc. 26-27) at 5, Part 3(c).) The EPA
Policies further prohibit the Chancellor from conferring upon any
EPA non-faculty employee the right to continued employment with
the University separate and apart from appointment to a specific
position. (See Pl.'s Supplement Ex. Z (Doc. 26-27) at 3, Part
2(E)(1)(b).) Therefore, Plaintiff's claim that he had "[s]ome
type of employment with the university" other than the AVC-EM
position is not only unsupported by the evidence, it also
disregards the prohibitions set forth in the EPA Policies. (Tr.
Summ. J. Hr'g (Doc. 46) at 6.)

     At the summary judgment hearing, Plaintiff's Counsel also
argued that Plaintiff "was transitioned into a different
position," other than the AVC-EM position, on September 19, 2007.
(Id. at 8.) To support this claim, Plaintiff's Counsel mentioned
two documents that allegedly reflect the transition, which
apparently had been designated as Exhibits 16 and 17 to Dr.
Brewington's deposition. (Id.) Only the document designated as
Exhibit 16 to Dr. Brewington's deposition has been produced as a
part of the record before this court. (See id. at 8, 35; see
also Pl.'s Supplement Ex. E (Doc. 26-6) at 1.) Exhibit 16 does

not reflect the transition described by Plaintiff's Counsel.
(Pl.'s Supplement Ex. E (Doc. 26-6) at 1.)  Instead, it appears
to be a personnel action reflecting a salary adjustment for
Plaintiff in the AVC-EM position that became effective on July 1,
2007.[10]  (Id.; see also Brewington Dep. (Doc. 26-4) at 66-67.)
As such, Exhibit 16 does not support Plaintiff's claim that he
was transitioned to another position in the University prior to
his termination on or about September 26, 2007.

In contrast, Plaintiff's Responses to Defendants' First Set
of Interrogatories and Request for Production of Documents
("Discovery Responses") reflect an entirely different version of
the facts from those adduced by Plaintiff's Counsel at the
summary judgment hearing.  (See Pl.'s Supplement Ex. I (Doc. 26-
10) at 2.)  In response to Defendants' second interrogatory,
which asks Plaintiff to "[s]tate the date [he] first became aware
that the position of [AVC-EM] had been posted as a vacancy,"
Plaintiff offers the following:

> Further, the position of Associate Vice
> Chancellor for Enrollment Management was never
> in a "vacant" status during plaintiff's tenure
> at North Carolina A&T State University.  He
> remained officially in the position of
> Associate Vice Chancellor for Enrollment
> Management, by title and position number, from
> 6/01/04 until 9/26/07 at which time he was
> transferred to the position of Associate Vice

---

[10] Although the date of preparation is listed as September
19, 2007, the "Effective Date" listed on the personnel action is
July 1, 2007.  (Pl.'s Supplement Ex. E (Doc. 26-6) at 1.)

> Chancellor for Institutional Assessment and
> Research.  Dr. Brewington's letter dated
> September 25, 2007 clearly states, "Therefore,
> effective September 26, 2007, your services
> and administrative responsibilities as
> Associate Vice Chancellor for Enrollment
> Management for North Carolina A&T State
> University will be discontinued."

(<u>Id.</u> at 2.)  In the face of such a response, Plaintiff cannot now

claim that any transfer to a position of Associate Vice

Chancellor for Institutional Assessment and Research[11] on

September 19, 2007, or at any time prior to the issuance of his

termination letter, constituted some continuing employment

completely separate and distinct from the AVC-EM position.  By

Plaintiff's own admission, Plaintiff remained in the AVC-EM

position from 2004 until the date of his termination on or about

September 26, 2007.  (<u>Id.</u>)

Although the document referred to as Exhibit 17 to Dr.

Brewington's deposition itself does not appear in the record,

Plaintiff's Counsel asked Dr. Brewington about the document

during her deposition. (Brewington Dep. (Doc. 26-4) at 67-69.)

Excerpts from Dr. Brewington's deposition testimony have been

---

[11] The record contains conflicting information about the
name of the position into which Plaintiff was transferred on or
about September 26, 2007.  Plaintiff uses the title "Associate
Vice Chancellor for Institutional Assessment and Research" in his
Discovery Responses (Pl.'s Supplement Ex. I (Doc. 26-10) at 2),
but Plaintiff's Counsel referred to the position as "Associate
Vice Chancellor for Planning, Assessment, and Research" during
Dr. Brewington's deposition (Brewington Dep. (Doc. 26-4) at 69).
This court adopts the title used in Plaintiff's Discovery
Responses.  (<u>See</u> Pl.'s Supplement Ex. I (Doc. 26-10) at 2.)

made a part of the record. (See generally Brewington Dep. (Doc.
26-4).) When asked to explain Exhibit 17, Dr. Brewington
testified that the University "had to transfer [Plaintiff] to a
position . . . so that [it] could pay him" for the remainder of
his 90-day notice period.[12] (Brewington Dep. (Doc. 26-4) at 68.)
Plaintiff has never disputed Dr. Brewington's testimony, nor has
he produced any evidence to suggest that the University
transferred him to the position of Associate Vice Chancellor for
Institutional Assessment and Research for any reason other than
for the accounting purpose of paying him during his notice
period. Therefore, Exhibit 17, even if it were a part of the
record, does not establish Plaintiff's claim that he had "[s]ome
type of employment" with NCA&T that would have continued past his
termination from the AVC-EM position plus the applicable notice
period. (Tr. Summ. J. Hr'g (Doc. 46) at 6.)

Finally, if Plaintiff claims that he had "[s]ome type of
employment with the university" other than the AVC-EM position,
then Plaintiff must also show that he was terminated from that
other employment. (Id.) Otherwise, there would have been no
adverse employment action. To demonstrate his wrongful
termination, Plaintiff points to the termination letter he
received from Dr. Brewington on or about September 28, 2007.

---

[12] The applicable notice period is set forth in the EPA
Policies at Part 3(A). (See Pl.'s Supplement Ex. Z (Doc. 26-27)
at 4, Part 3(A).)

(Compl. (Doc. 4) ¶ 18; Pl.'s Response (Doc. 27) at 5; <u>see also</u>
Pl.'s Supplement Ex. S (Doc. 26-20).)  That termination letter
reads as follows:

> In a meeting with me on July 19, 2007, you
> were informed that you were not selected as a
> candidate to interview for the Associate Vice
> Chancellor for Enrollment Management position.
> On September 7, 2007, you were also advised by
> the search committee that you were not the
> successful candidate.  Therefore, effective
> September 26, 2007, your services and
> administrative responsibilities *as Associate
> Vice Chancellor for Enrollment Management* for
> North Carolina A&T State University will be
> discontinued.

(Pl.'s Supplement Ex. S (Doc. 26-20) at 1 (emphasis added).)

The only employment mentioned in the termination letter is
Plaintiff's employment as AVC-EM; the letter does not mention any
other type of employment, nor does it mention the position of
Associate Vice Chancellor for Institutional Assessment and
Research.  (<u>Id.</u>)  Indeed, the letter purports only to terminate
Plaintiff's "services and administrative responsibilities as
Associate Vice Chancellor for Enrollment Management."  (<u>Id.</u>)  The
only termination supported by the evidence in this record is
Plaintiff's termination from the AVC-EM position.  Plaintiff's
attempt to transmute the September 25, 2007 termination letter
into evidence of his termination from "[s]ome other type of
employment" is not supported by the evidence.  (Tr. Summ. J. Hr'g
(Doc. 46) at 6.)  Because Plaintiff can neither show that he had
some other type of employment nor that he was terminated from

said employment, Plaintiff's first theory of adverse employment action fails.

### 2. Defendants' Withdrawal of Plaintiff from Consideration for an Open Position and Any Other Positions

In his second theory of adverse employment action, Plaintiff advances two arguments that "the University took an adverse employment decision against [him] when it withdrew him [from] consideration for the open position, and any other positions." (Pl.'s Response (Doc. 27) at 13-14.) First, Plaintiff claims that "Defendant NCA&T University had a policy and practice of finding suitable alternative employment for employees displaced through no fault of their own who had been performing successfully" and that the University ceased its efforts to implement the policy or practice on Plaintiff's behalf in retaliation for Plaintiff's taking of FMLA leave. (Compl. (Doc. 4) ¶¶ 14, 29; see also Pl.'s Response (Doc. 27) at 5, 13-14; Pl.'s Objections (Doc. 36) at 11-12.) Second, Plaintiff argues that "Dr. Brewington used [his] taking of FMLA leave as a negative factor when it [sic] withdrew him from consideration [for] an alternative position. (Pl.'s Response (Doc. 27) at 14.)

### a. Defendant's Failure to Implement a Transfer Policy or Practice on Plaintiff's Behalf

Plaintiff has failed to produce any evidence that Defendants had an independent legal duty to find suitable alternative

21

employment for him.[13]  Instead, Plaintiff attempts to show that

Defendants "had a policy and practice of finding suitable

alternative employment for employees displaced through no fault

of their own who had been performing successfully" and that they

"discriminated and retaliated against [Plaintiff] when, in

September 2007, they ceased all efforts to find suitable

alternative employment for [him] at the conclusion of his

approved leave."[14]  (Compl. (Doc. 4) ¶¶ 14, 29.)

Plaintiff's claim fails for several reasons.  First, even

assuming that Defendants did have a policy or practice as

Plaintiff describes, Plaintiff has failed to show that he would

---

[13] In fact, 29 C.F.R. § 825.216 provides that "[a]n employee
has no greater right to reinstatement or to other benefits and
conditions of employment than if the employee had been
continuously employed during the FMLA leave period."  29 C.F.R. §
825.216(a).  Moreover, the EPA Policies prohibit the Chancellor
from "purport[ing] to confer on any [senior administrative
officer] a period of employment of fixed duration or otherwise
confer[ring] any property interest in such employment."  (Pl.'s
Supplement Ex. Z (Doc. 26-27) at 3, Part 2(E)(1)(b).)  The EPA
Policies also provide that "[a]n EPA non-faculty employee who is
employed at will has no claim to a position at the University."
(Id. at 5, Part 3(c).)

[14] Plaintiff's FMLA leave was approved through November 16,
2007.  (Pl.'s Supplement Ex. L (Doc. 26-13) at 1.)  Hence,
Plaintiff's approved leave had not yet been concluded at the time
that his termination became effective on September 26, 2007.
(Id.; see also Pl.'s Supplement Ex. S (Doc. 26-20) at 1.)  By
claiming that Defendants "ceased all efforts to find suitable
alternative employment for [him] at the conclusion of his
approved leave," Plaintiff again blurs the lines between his
retaliation claim and a direct claim for interference with his
substantive rights under the FMLA.  (Compl. (Doc. 4) ¶ 29
(emphasis added).)  See supra note 8.

have qualified to receive the benefit of the policy or practice. Plaintiff himself asserts that the University's policy or practice applied only to individuals who were displaced "through no fault of their own" and "who had been performing fully successfully." (Id. ¶ 14.) Yet, Plaintiff has failed to show that he was "displaced through no fault of [his] own" or that he "had been performing fully successfully." (Id.)

In fact, Defendants have produced undisputed evidence that Plaintiff was displaced due to his own inadequacy in his role as AVC-EM. Specifically, Interim Chancellor Hackley stated in his affidavit that he decided to post Plaintiff's position because he "had concerns about what Plaintiff was doing to raise the number and the academic quality of entering students." (Hackley Aff. (Doc. 20-5) ¶ 4.) Plaintiff has not produced any evidence to suggest that he was replaced as AVC-EM for any reason other than the reasons alleged by Interim Chancellor Hackley.[15] (Id.)

---

[15] As evidence of his successful performance, Plaintiff proffers his 2006-2007 Academic Year Report Card, in which he received ratings of "Outstanding," "Superior," and "Fully Successful" in sixteen (16) out of seventeen (17) categories. (Pl.'s Supplement Ex. F (Doc. 26-7) at 1.) Plaintiff received a rating of "Minimally Successful" for his competency in the "Results Driven - Accountability" category. (Id.) Nevertheless, even when viewed in the light most favorable to Plaintiff, this document standing alone does not establish that Plaintiff was displaced "through no fault of [his] own" or that he "had been performing fully successfully." (Compl. (Doc. 4) ¶ 14.) Because the Report Card was completed by Dr. Brewington, it does not contradict Interim Chancellor Hackley's testimony that he made the decision to post Plaintiff's position due to his concerns about Plaintiff's performance. Moreover, the Report Card was

Without such evidence, Plaintiff cannot show that the University

had an obligation to find him suitable alternative employment,

even assuming that a policy or practice of finding such

alternative employment for qualified employees existed.

Furthermore, Plaintiff has failed to establish that such a

policy or practice did exist.  Plaintiff has presented no

evidence of any written University policy that obligated the

University to find suitable alternative employment for displaced

employees.  When asked during his deposition if he knew of a

"written policy" as he alleged, Plaintiff stated that he was "not

aware of a particular policy."[16]  (Young Dep. (Doc. 20-6) at 85.)

---

completed in August 2007, several months after Interim Chancellor
Hackley decided to post Plaintiff's position.  (Pl.'s Supplement
Ex. F (Doc. 26-7) at 1; Young Dep. (Doc. 26-2) at 48, 50.)
Plaintiff also has not produced any evidence to show that he was
denied an interview for any reason other than the AVC-EM Search
Committee's independent belief that he was not the best candidate
for the job.

[16] In Objection IV, Plaintiff makes much of the Magistrate
Judge's use of this quotation and the words "policy" and
"practice."  (Pl.'s Objections (Doc. 36) at 11-12.)  While this
court agrees with Plaintiff that Plaintiff was referring to a
written policy when he stated in his deposition that he was "not
aware of a particular policy," this court does not find the
Magistrate Judge's use of the quotation or the terms "policy" and
"practice" to be inconsistent with that reading of the quotation.
(See Young Dep. (Doc. 20-6) at 85; Recommendation (Doc. 30) at 13
& n.5.)  Specifically, this court disagrees with Plaintiff's
objection that the Magistrate Judge "used [the] quotation out of
context."  (Pl.'s Objections (Doc. 36) at 11.)  The Magistrate
Judge clearly used the term "policy" to refer to a written
procedure and the term "practice" to refer to an unwritten
custom.  (See Recommendation (Doc. 30) at 13.)  Moreover, the
Magistrate Judge indicated that in the absence of a written
policy, Plaintiff must still establish the existence of an

The EPA Policies state only that the University "may determine that it is in its best interest to assign an employee . . . to another administrative or teaching position." (Pl.'s Supplement Ex. Z (Doc. 26-27) at 5, Part 3(c) (emphasis added).) Such language does not evidence a wholesale custom of transferring all displaced employees into equivalent alternative positions. Thus, Plaintiff has failed to show that the University had a written policy requiring that he be transferred to an alternative position when the decision was made to replace him as AVC-EM.

In the absence of evidence of a written policy, Plaintiff has attempted to establish that the University had an unwritten "practice" of finding suitable alternative employment for displaced employees. (Young Dep. (Doc. 20-6) at 85.) Plaintiff not only claims that the University had a practice of transferring displaced employees into alternative positions, but he also claims that the University had a practice of transferring displaced individuals into "comparable, equivalent" positions. (Pl.'s Supplement Ex. R (Doc. 26-19) at 1.) Under Plaintiff's definition of an "equivalent position," only a "reasonable salary reduction" is acceptable in the event of a transfer. (<u>Id.</u>) During his deposition, Plaintiff stated that he considered a reasonable salary reduction to be approximately ten to fifteen

unwritten practice of finding suitable alternative employment for displaced employees. (<u>Id.</u>)

25

percent (10-15%). (Young Dep. (Doc. 26-2) at 56.) However, Plaintiff has produced no evidence that the University defined "equivalent" in the same manner as Plaintiff, even assuming the University had such a practice.[17]

In an effort to establish a practice by the University, Plaintiff has identified fourteen (14) individuals in his Discovery Responses who allegedly exemplify the University's "practice of transitioning employees from their current position to a new similar position." (Pl.'s Supplement Ex. I (Doc. 26-10) at 4-5.) The Magistrate Judge's Recommendation accurately pointed out the reasons this evidence is materially insufficient. (See Recommendation (Doc. 30) at 13-15.) As the Magistrate Judge noted, Plaintiff has failed to produce evidence comparing the salaries of the fourteen (14) individuals before and after they were transferred into alternative employment positions. (Id. at 13; see also Young Dep. (Doc. 20-6) at 85.) The only evidence in

---

[17] This court notes that if, instead, the University had a practice of merely transferring displaced individuals into any alternative position regardless of compensation equivalency, then the undisputed evidence in this case would show that the University implemented this practice on Plaintiff's behalf and that Plaintiff failed to accept the alternative position offered to him. (See infra Part II.A.2(b) at 30-33; see also Young Dep. (Doc. 26-2) at 59.) Under those facts, no reasonable jury could find that Dr. Brewington ceased her efforts to find Plaintiff alternative employment in retaliation for his securing FMLA leave without her approval. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (noting that a dispute about a material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

the record that speaks to that issue shows that employees who were transferred by the University suffered a reduction in pay upon their transfer, including Dr. Sheila Benton ("Dr. Benton") who suffered a fifty-percent (50%) reduction in her salary when she was transferred. (Benton Dep. (Doc. 20-8) at 37; Young Dep. (Doc. 20-6) at 85; Brewington Dep. (Doc. 26-4) at 148, 151-52.)

In Objection II, Plaintiff mischaracterizes the Magistrate Judge's analysis of the evidence of other transferred employees. (See Pl.'s Objections (Doc. 36) at 6-9; see also Recommendation (Doc. 30) at 12-15.) Plaintiff argues that because "[t]his is not a 'discrimination' claim, . . . it is not necessary to determine that Plaintiff was treated differently than similarly situated employees."[18] (Pl.'s Objections (Doc. 36) at 6.) This court disagrees with Plaintiff's conclusion and adopts the Magistrate Judge's analysis. The Magistrate Judge considered the evidence of other employees who had been transferred at NCA&T in an effort to determine whether, as Plaintiff alleged, the University had a practice of finding suitable alternative employment for displaced employees. In Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff supports his

---

[18] Plaintiff refers to the typical method of proof in an employment discrimination claim. For example, in a Title VII discrimination claim, the fourth element of the plaintiff's prima facie case requires the plaintiff to prove that after he was rejected for the position in question, the position remained open to applicants with similar qualifications. McDonnell Douglas, 411 U.S. at 802.

claim that "[t]he University had a long-standing practice of
finding alternative employment" by citing his answer to
Defendants' Interrogatory Number Five (5), Dr. Benton's
Deposition, and Dr. Brewington's Deposition. (Pl.'s Response
(Doc. 27) at 2-3.) This is the same evidence to which the
Magistrate Judge referred on pages twelve (12) through fifteen
(15) of the Recommendation. (See Recommendation (Doc. 30) at 12-
15.) By considering this evidence, the Magistrate Judge was not
suggesting that Plaintiff had to prove that he "was treated
differently than similarly situated employees." (Pl.'s
Objections (Doc. 36) at 6.) The Magistrate Judge was simply
reviewing the evidence proffered by Plaintiff to prove the
existence of the University's "long-standing practice of finding
alternative employment for administrative personnel," the proof
of which is essential to this theory of adverse employment
action.[19] (Pl.'s Response(Doc. 27) at 2.) As the Magistrate
Judge found, Plaintiff has failed to prove that the University
had a practice of finding suitable alternative employment for
displaced employees. Therefore, Plaintiff cannot demonstrate

---

[19] Even if Plaintiff's statement that the University had a
long-standing practice of transferring displaced individuals may
be considered a factual statement, as opposed to a conclusory
statement, such a statement is based on other facts adduced by
Plaintiff himself. (See Pl.'s Response(Doc. 27) at 2-3.) To the
extent that those other facts are undisputed and do not support
Plaintiff's statement, Plaintiff's own evidence fails to
demonstrate the existence of a material fact.

that he suffered an adverse employment action by relying upon an
employment action which does not exist in writing or in practice.

### b. Defendants' Withdrawal of Plaintiff from Consideration for Any Open Positions

Finally, as an alternative to his "policy or practice"
theory of adverse employment action, Plaintiff argues that Dr.
Brewington and Interim Chancellor Hackley promised to transfer
him to an equivalent alternative position and that Dr. Brewington
"used [Plaintiff's] taking of FMLA leave as a negative factor
when it [sic] withdrew him from consideration [for] an
alternative position." (Pl.'s Response (Doc. 27) at 14.) This
court disagrees.

First, Plaintiff has produced no evidence to demonstrate
what constitutes an "equivalent position," other than his own
conclusory opinion as to what constitutes a reasonable salary
reduction and, therefore, an equivalent position. (Young Dep.
(Doc. 26-2) at 52, 56.) Absent some other evidence, a jury would
simply be speculating as to what Interim Chancellor Hackley and
Dr. Brewington meant when they told Plaintiff that he would be
"transferred to an equivalent position on campus."[20] (Id. at 52.)

_____

[20] "[T]he terms of a contract must be definite and certain
or capable of being made so," such that the parties "assent to
the same thing, in the same sense." Horton v. Humble Oil &
Refining Co., 255 N.C. 675, 679 (1961). As more fully discussed
herein, the Chancellor and/or his designee, not Dr. Brewington,
had exclusive authority to appoint an individual to an EPA non-
faculty position. (Pl.'s Supplement Ex. Z (Doc. 26-27) at 2,
Part 2(A).) Whether Interim Chancellor Hackley's use of the term

29

Ultimately, there is no evidence to suggest that Dr. Brewington's disclosure of the positions with Dr. Welborne was not a full performance of any representation made by Dr. Brewington or Interim Chancellor Hackley, and Plaintiff neither accepted the positions with Dr. Welborne, nor applied for any other positions.

Because Plaintiff cannot prove that Defendants had an established practice of finding equivalent alternative positions for displaced employees, Plaintiff has advanced a new argument in his Objections to demonstrate that he suffered an adverse employment action. Plaintiff now argues that "he need only prove that the process was initiated – which all agree – and that the reason it was stopped was in retaliation [for] . . . his lawful exercise of his FMLA rights." (Pl.'s Objections (Doc. 36) at 7.) This court disagrees.

To show that Defendants "initiated" the alleged "process" on his behalf, Plaintiff relies on the position Dr. Brewington found for him with Dr. Welborne. (Id.) Plaintiff does not claim that the position Dr. Brewington identified was inappropriate or a violation of the process from the outset; Plaintiff only rejected

_____

"equivalent position" referred to the type of position, the salary, or both is not clear from the record. (Young Dep. (Doc. 26-2) at 52.) Moreover, Chancellor Battle replaced Interim Chancellor Hackley in July 2007. (Brewington Dep. (Doc. 26-4) at 34.) In the absence of a written policy or established practice, the statements by Interim Chancellor Hackley and Dr. Brewington are too speculative to support a cause of action as to the Defendants named in this case.

the salary for the position with Dr. Welborne because it was not

"comparable."[21]  (Id; see also Young Dep. (Doc. 26-2) at 56, 58-

59.)  Assuming, arquendo, that there was a "process," there is no

evidence that Dr. Brewington's identification of the position

with Dr. Welborne represented the initiation of the "process,"

rather than the completion of the "process."[22]  (Pl.'s Objections

---

[21] In the e-mail Plaintiff sent to Dr. Brewington on
September 7, 2007, expressing his disappointment with the
Welborne position, Plaintiff did not reference the alleged
promise that she and Interim Chancellor Hackley made to find him
an equivalent position.  (Pl.'s Supplement Ex. R (Doc. 26-19) at
1.)  Instead, Plaintiff wrote, "I know when attempting to place a
person coming off of [FMLA leave], or otherwise trying to
relocate a long-time employee, North Carolina A & T State
University would do its best to find a comparable, equivalent
position."  (Id.)  Plaintiff's statement again conflates his
situation with that of an employee entitled "to be restored to an
equivalent position" under 29 U.S.C. § 2614(a)(1)(B).  Putting
aside the fact that Plaintiff has not brought a direct
interference claim under 29 U.S.C. § 2615(a)(1), his statement
also ignores the limitations of 29 U.S.C. § 2614(a)(3) and 29
C.F.R. § 825.216(a)(1).  See also Yashenko, 446 F.3d at 547-48
(rejecting the proposition that 29 U.S.C. § 2614 "creates an
absolute entitlement to restoration," based, in part, on the idea
that an employer should not have to restore "a poorly performing
employee" to his prior position when that employee "takes FMLA
leave before his employer can discharge him").  See supra notes
8, 14.

[22] This fact is further supported by the example of James
Gooch, which is contained in the record. (See Brewington Dep.
(Doc. 26-4) at 151-53; see also Pl.'s Supplement Ex. I (Doc. 26-
10) at 4.)  When Mr. Gooch was replaced in his position as the
Director of Public Health, Dr. Brewington attempted to find Mr.
Gooch another position in the University.  (Brewington Dep. (Doc.
26-4) at 151.)  Dr. Brewington identified a position commensurate
with Mr. Gooch's skills and expertise, but Mr. Gooch decided not
to accept the position because it paid less than he had been
making as the Director of Public Health. (Id.)  As a result,
Gooch received a termination letter.  (Id. at 151-52.)

(Doc. 36) at 7.)  Plaintiff himself failed to communicate his

acceptance of the position, or to initiate an application for the

position.  (See Pl.'s Supplement Ex. R (26-19) at 1.)  To accept

Plaintiff's claim that the "process" had only been "initiated" by

the University would be to impose upon the University an

indefinite obligation to continue searching for alternative

employment for a displaced employee until all of the employee's

demands had been met, whether reasonable or not.[23]

At least one district court in the Fourth Circuit has

recognized that an employer's "failure to affirmatively find and

recommend new jobs to [an employee] cannot be considered an

adverse employment action."  King v. Marriott Int'l, Inc., No.

9:05-1774-PMD-RSC, 2007 WL 951738, at *10 (D.S.C. Mar. 27, 2007).

In King, the plaintiff claimed that his supervisors' "failure to

recommend [him] or otherwise affirmatively help [him] get another

position with Marriott following his termination [was] an adverse

employment action for which a retaliation claim lies."  Id.  In

granting summary judgment, the King court rejected the

---

[23] Plaintiff disputes the conclusions that are properly
drawn from his response to Dr. Brewington via e-mail on September
7, 2007.  (See Pl.'s Supplement Ex. R (Doc. 26-19) at 1.)  Dr.
Brewington's August 31 e-mail stated, "Please let me know as soon
as possible . . . if you still want me to pursue the position
with Dr. Welborne next week." (Pl.'s Supplement Ex. P (Doc. 26-
17) at 1.)  Plaintiff responded that he "was surprised to learn
of the salary for the position" and that he was interested in
staying at NCA&T in "a position equivalent to [his] current
position" and was "willing to accept a reasonable salary
reduction."  (Id.)

Plaintiff's argument, stating that "[a] reasonable employee . . .
would not have felt that his former employer had an obligation to
do more than Marriott did." Id. The court further noted that
"the failure to hire an employee for a position for which he
applied is a recognizable adverse employment action; however, the
failure to inform a former employee about posted available
positions and affirmatively aid him in getting these jobs is
not." Id. at *11. Here, Plaintiff has not shown that he
applied for any positions at the University. Moreover, Dr.
Brewington identified at least two possible positions for
Plaintiff, and Plaintiff failed to express any interest in the
positions as identified. (See Plaintiff's Supplement Ex. R.
(Doc. 26-19) at 1.)

Second, Plaintiff has not produced any evidence to support
his claim that Dr. Brewington actively "withdrew him from
consideration [for] an alternative position." (Pl.'s Response
(Doc. 27) at 14.) Plaintiff claims that "[s]uch withdrawal of
consideration [was] a 'hiring action,'" under the FMLA, but
Plaintiff has not shown that Dr. Brewington actually withdrew him
from consideration for the position with Dr. Welborne or that she
took any other hiring actions with regard to his employment.
(Id.) Plaintiff has offered no evidence to demonstrate that he
applied for or otherwise requested consideration for employment
in the position with Dr. Welborne or any other position at the

University.  See generally Magiera v. City of Dallas, 389 F.
App'x 433, 438 (5th Cir. 2010) (holding employer's denial of
lateral transfer opportunities did not amount to adverse
employment action where plaintiff had produced no evidence to
demonstrate what, if any, positions she applied for); Chandler v.
Casual Corner Grp., Inc., 9 F. App'x 235, 236 (4th Cir. 2001)
(holding that employer's failure to promote employee to store
manager position did not constitute adverse employment action
where employee never applied for the position).

According to Plaintiff's version of the facts, Plaintiff and
Dr. Brewington exchanged a series of e-mails in late August and
early September 2007, and then, Plaintiff did not hear from Dr.
Brewington until she telephoned him on or about September 25,
2007, to notify him of his termination from the AVC-EM position.
(Young Dep. (Doc. 26-2) at 60-61.)  Plaintiff received a
termination letter to that effect on or about September 28, 2007.
(Id.; Compl. (Doc. 4) ¶ 18; Pl.'s Supplement Ex. S (Doc. 26-20).)
As discussed in Part II.A.1 above, Plaintiff's termination was
already set in motion before he ever communicated any desire to
take FMLA leave.  (See supra Part II.A.1 at 19-20; see also Young
Dep. (Doc. 26-2) at 45, 50, 53-54; Hackley Aff. (Doc. 20-5) ¶ 4-
5.)

Therefore, the termination letter dated September 25, 2007,
represents the undisputed, inevitable conclusion of the process

that had been set in motion by Interim Chancellor Hackley's
decision to post Plaintiff's position and the AVC-EM Search
Committee's subsequent decision not to interview Plaintiff for
the AVC-EM position. (See id.) See Aquilino v. Univ. of Kan.,
268 F.3d 930, 934 (10th Cir. 2001) (holding that state
university's removal of assistant professor from dissertation
committee six months before the expiration of her contract, but
after the university's decision to deny her tenure, did not
constitute an "adverse employment action" to support her Title
VII retaliation claim because removal from the dissertation
committee was a "normal incident of the denial of tenure").  Like
the Aquilino plaintiff's removal from the dissertation committee,
the September 25, 2007 termination letter that Plaintiff received
was a "normal incident" to the decision not to interview him for
the AVC-EM position.  268 F.3d at 936.  As such, the termination
letter does not provide evidence that Dr. Brewington withdrew
Plaintiff from consideration for an alternative position.

Plaintiff also points to his own deposition testimony to
support his claim that Dr. Brewington "unilaterally withdrew
[Plaintiff's] name . . . from consideration." (Pl.'s Response
(Doc. 27) at 14.)  Plaintiff's testimony only establishes that he
did not hear from Dr. Brewington after he sent his September 7 e-
mail until she telephoned him to notify him of his termination;
it does not establish that Dr. Brewington actively withdrew him

from consideration for the position with Dr. Welborne. (Young Dep. (Doc. 26-2) at 54-61.) However, the undisputed evidence demonstrates that Dr. Brewington identified an alternative position with Dr. Welborne and that Plaintiff never communicated his interest in or acceptance of the position as identified.[24] (Young Dep. (Doc. 26-2) at 59; Brewington Aff. (Doc. 20-4) ¶ 15.)

Finally, Plaintiff asserts that Dr. Welborne "len[t] support" to his claim that Dr. Brewington withdrew him from consideration "by testifying that [Dr. Welborne] was never consulted and that the position remained open through December as far as he was concerned." (Pl.'s Response (Doc. 27) at 14.) However, Dr. Welborne also testified that "[Dr. Brewington] told [him] that [Plaintiff] would no longer be considering [the] position" in Dr. Welborne's office. (Welborne Dep. (Doc. 26-16) at 22.) When the facts are viewed in the light most favorable to the Plaintiff, it may be that Plaintiff never specifically rejected the position with Dr. Welborne, but the undisputed facts show that Plaintiff did not accept the position with Dr. Welborne, nor did Plaintiff express interest in the position when Dr. Brewington gave him the opportunity to do so. (See Pl.'s

_____

[24] When asked during his deposition whether he would have turned down the position with Dr. Welborne that paid $75,000 per year, Plaintiff responded, "I think I would have asked [Dr. Brewington] to consider some other options." (Young Dep. (Doc. 26-2) at 59.) Plaintiff has proffered no evidence as to what those other options were, nor does the record contain evidence of any other options.

Supplement Ex. P (Doc. 26-17) at 1.)  Plaintiff has failed to
show that the University had any open positions suited to his
qualifications other than the positions with Dr. Welborne that
Plaintiff did not accept.

A jury would ultimately be required to speculate in order to
find that the University denied Plaintiff access to other
positions when none have been shown to have existed, and
"[s]peculative harm does not constitute adverse employment
action." Aquilino, 268 F.3d at 936.  Therefore, because
Plaintiff has "present[ed] no evidence of adverse action apart
from his own conclusory allegations, summary judgment is
appropriate." Cuenca v. Univ. of Kan., 265 F. Supp. 2d 1191,
1208 (D. Kan. 2003) (citing Aquilino, 268 F.3d at 930).  See also
Magiera, 389 F. App'x at 438 (quoting Douglass v. United Servs.
Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996)) ("'In short,
conclusory allegations, speculation and unsubstantiated
assertions are inadequate to satisfy the nonmovant's burden [on
summary judgment in an employment discrimination case].'").
Because Plaintiff has produced no other evidence to support his
claim that Dr. Brewington "withdrew him from consideration [for]
an alternative position," Plaintiff's final theory of adverse
employment action fails.  (Pl.'s Response (Doc. 27) at 14.)

**B.    Causal Connection**

Even assuming that Defendant University did cease its
efforts to find Plaintiff an alternative position at the
University, Plaintiff has failed to demonstrate a causal
connection between the University's cessation of its efforts to
find an alternative position for Plaintiff and Plaintiff's taking
FMLA leave without Dr. Brewington's approval, as required by the
third element of a retaliation claim.  See Yashenko, 446 F.3d at
551.  In his Objections, Plaintiff reiterates that the "event
that precipitated retaliation . . . was the approval of
[Plaintiff's] FMLA [leave] without [Dr. Brewington's] supervisory
approval."  (Pl.'s Objections. (Doc. 36) at 12.)  However,
Plaintiff has failed to present evidence that connects this event
to Dr. Brewington's alleged suspension of her efforts to find
alternative employment for Plaintiff.

Dr. Brewington's August 31, 2007 e-mail to Plaintiff
controverts the causal connection claimed by Plaintiff.  In Dr.
Brewington's e-mail, which she wrote after Plaintiff had already
begun his FMLA leave, Dr. Brewington informs Plaintiff that she
and Dr. Welborne "are meeting next week to determine, which [of
the positions available with Dr. Welborne] to offer to
[Plaintiff]."  (Pl.'s Supplement Ex. P (Doc. 26-17) at 1.)  In
the very same e-mail, Dr. Brewington tells Plaintiff that she
"did receive the FMLA information from HR" and that "[she is]

38

supportive." (<u>Id.</u>) Dr. Brewington concludes her e-mail by asking Plaintiff to "let [her] know as soon as possible . . . if [he] still want[s] [her] to pursue the position with Dr. Welborne next week." (<u>Id.</u>) Dr. Brewington's simultaneous discussion of Plaintiff's FMLA leave and her efforts to secure a position for him with Dr. Welborne undermine Plaintiff's claim that Dr. Brewington ceased her efforts fo find him alternative employment when she learned that Plaintiff had been approved for FMLA leave without her approval.

Instead, the undisputed evidence shows that Dr. Brewington ceased her efforts to find an alternative position for Plaintiff after Plaintiff failed to affirmatively accept the position with Dr. Welborne. In Objection II, Plaintiff asserts that the Magistrate Judge "ignore[d] Plaintiff's testimony" concerning the telephone call between Dr. Brewington and Plaintiff that Defendants alleged took place while Plaintiff was on FMLA leave. (Pl.'s Objections (Doc. 36) at 7; <u>see also</u> Brewington Aff. (Doc. 20-4) ¶ 15.) For the purposes of deciding summary judgment, this court relies on Plaintiff's version of the facts and therefore, assumes that such a telephone call did not occur. <u>See</u> <u>Charbonnages de France</u>, 597 F.2d at 414.

Nevertheless, neither party disputes the fact that Plaintiff never accepted the position with Dr. Welborne. Moreover, according to Plaintiff's version of the facts, Plaintiff's last

communication with Dr. Brewington before he received the termination letter on September 28, 2007, was the e-mail that he sent to Dr. Brewington on September 7, 2007. (Young Dep. (Doc. 26-2) at 57-61.) Even if Plaintiff never rejected the position with Dr. Welborne by telephone, Plaintiff's e-mail indicates that Plaintiff was not willing to accept any position that included a salary reduction that he deemed to be unreasonable. (See Pl.'s Supplement Ex. R (Doc. 26-19) at 1; see also Young Dep. (Doc. 26-2) at 56-59.) Plaintiff's e-mail implies that he did not consider the "40-45% [salary] reduction" that he would have faced if he had accepted the position with Dr. Welborne to be reasonable, and his deposition testimony corroborates this. (Id.) Plaintiff has never claimed that he intended to accept the position with Dr. Welborne, and his deposition testimony indicates that he would not have accepted the position with Dr. Welborne at a salary of $75,000. (Young Dep. (Doc. 26-2) at 56, 59.) Thus, the undisputed evidence demonstrates that the University ceased its efforts to find alternative employment for Plaintiff only after Plaintiff declined to accept the position with Dr. Welborne. Therefore, Plaintiff has failed to demonstrate a causal connection necessary to survive summary judgment on his FMLA claim for retaliation.

**III. CONCLUSION**

Because Plaintiff has failed to prove that he suffered an adverse employment action, or in the alternative, that there was a causal relationship between Defendants' cessation of its efforts to find him suitable alternative employment and Plaintiff's taking of FMLA leave, summary judgment should be granted in favor of Defendants.

IT IS THEREFORE ORDERED that the Magistrate Judge's Recommendation (Doc. 30) is ADOPTED. IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 20) is GRANTED. A judgment dismissing this action will be entered contemporaneously with this Order.

This the 18th day of February 2011.

William L. Osteen, Jr.
United States District Judge